## In re NAPHTALY.

### No. 8025; December 30, 1881.

**Attorney—Suspension for Violating Bankrupt Law.**—An attorney, with knowledge of the facts, who advises and takes steps to assist in a violation of the bankrupt law of the United States, whereby one creditor unlawfully secures a preference, is subject to suspension.

Stanly, Cary & Baldwin for the prosecution; McAllister & Bergin for defendant.

MYRICK, J.—This is an application made to this court that Joseph Naphtaly, an attorney and counselor of this court, be removed. The information is laid and the prosecution made by a committee of the Bar Association of the city and county of San Francisco, appointed for that purpose. In proceedings had before the association for the purpose of determining whether it would institute measures for his removal, Mr. Naphtaly had leave to make such statement as he desired; and in pursuance thereof he made a statement in writing, which was introduced in evidence on the hearing of this matter, and from which we hereinafter copy.

The charges made against the respondent are:

"That the said Joseph Naphtaly has violated his duties as a member of the bar of this court and as an attorney and counselor at law as aforesaid, by employing, for the purpose of maintaining a cause confided to him, means which he knew were false and inconsistent with truth.

"The said Joseph Naphtaly has violated his duty as a member of the bar of this court and as an attorney and counselor as aforesaid, by his failure and neglect to support the laws of the United States and of this state.

"That the said Joseph Naphtaly has violated his duty as a member of the bar of this court and as an attorney and counselor as aforesaid, in counseling and maintaining an action and proceeding grossly unjust.

"That the said Joseph Naphtaly has violated his duties as a member of the bar of this court and as an attorney and counselor at law as aforesaid, in not maintaining the respect due to the courts of justice of the state of California."

The specifications accompanying the charges embrace the facts hereinafter stated, and relate to advice given and steps taken by the accused in and about certain matters of business intrusted to his care, conduct and management as an attorney and counselor at law.

First. By section 282 of the Code of Civil Procedure of this state it is made the duty of an attorney and counselor:

To counsel and maintain such actions, proceedings or defenses only as appear to him legal or just, except the defense of a person charged with a public offense; to employ, for the purpose of maintaining the causes confided to him, such means only as are consistent with truth, and never seek to mislead the judge or any judicial officer by an artifice or false statement; nor to encourage either the commencement or the continuance of an action or proceeding from any corrupt motive of interest.

The oath of an attorney and counselor is that he will support the constitution of the United States of this state, and that he will faithfully discharge the duties of an attorney and counselor at law to the best of his ability.

By section 287, Code of Civil Procedure, an attorney and counselor may be removed or suspended by this court for any violation of the oath taken by him or of his duties as such attorney and counselor.

Under the constitution of the United States, Congress has power to pass a general bankrupt law. Under that power a law was passed (see U. S. Rev. Stats., p. 969, amended June 22, 1874, Supp. Vol. 1, p. 71), which was in existence at the time of the transactions herein referred to. By section 5021 it was provided that if any person, being insolvent, shall procure his property to be taken on legal process, with intent to give a preference to one or more of his creditors, or with the intent by such disposition of his property to defeat or delay the operation of the act, or who, being a banker, broker, merchant, trader, manufacturer, or miner, has stopped, suspended, and not resumed payment of his commercial paper within a period of forty days, he shall be deemed to have committed an act of bankruptcy, and to have become liable to be

adjudged a bankrupt, and the assignee may recover the property, and the creditor shall not be allowed to prove his debt in bankruptcy. The adjudication might be had on the petition of creditors, constituting one-fourth in number, with provable debts at least one-third in amount. It was also provided that the title to the property of a bankrupt shall vest in the assignee as of the commencement of the proceedings, although the same was then attached on mesne process, and any attachment made within four months next preceding the commencement of the proceedings should be dissolved.

Second. As to the facts. Schoenfeld, Cohn and Newman were partners in business, merchants, under the firm name of Schoenfeld, Cohn & Co., in the city and county of San Francisco. In 1874 one Lewis, as appears from the evidence, lent to said Newman, for the use of the firm, the sums of $5,000, $3,000, $2,000 and $8,000, in all $18,000, for which sums the notes of the firm were executed, payable on demand, to the order of Newman, which notes were indorsed by Newman and delivered to Lewis. In September, 1876, Newman became embarrassed by reason of stock speculations, and requested of Lewis the use of the notes to pledge with the London and San Francisco Bank, Limited, for his individual debt of $6,000, which request was complied with, and the notes were accordingly pledged. In December, 1876, Lewis demanded of Newman the delivery of the notes pledged, but Newman declared his inability to comply with the demand. It was then agreed that Lewis should be paid $1,000, and should have another note of the firm for $17,000, payable on demand. This $17,000 note was drawn by Schoenfeld, and was delivered to Lewis December 23, 1876, bearing date that day payable on demand, and is in this opinion denominated the "demand" note. The pledged notes remained with the bank as a pledge. About June 10, 1877, Lewis was informed by the partners that the firm was insolvent, and in a conversation had between them, it was agreed to save first all confidential claims, and then the California creditors; the danger of eastern creditors putting the firm into bankruptcy was discussed, and it was agreed between the parties, Lewis and the partners, that Mr. Naphtaly should be consulted with reference to the matter; and on the 27th of June, 1877, Lewis, Newman and Schoenfeld consulted with Mr. Naphtaly, and "he was retained to manage the affairs so that no proceedings in bankruptcy could

be instituted, and if instituted, that they should not be sustained.'' The firm was at that time insolvent, and was indebted largely to California as well as eastern creditors, of which facts Mr. Naphtaly was informed. Another note was involved in the transaction, viz.: A Mrs. Alexander had placed $5,000 in the hands of Newman, to loan for her benefit, and the amount was taken by Schoenfeld, he giving his note and placing the money in the business of the firm. Mrs. Alexander did not have the custody of Schoenfeld's note, but had received monthly payments of interest from the firm.

Mr. Naphtaly, in the statement above referred to, says:

''He [Lewis] informed me that the firm, Schoenfeld, Cohn & Co., owed him $31,000, on the following notes: Note for $17,000, dated December, 1876, payable on demand, made by Schoenfeld, Cohn & Co.; note for $2,000, made by said firm; note for $8,000, made by S. Schoenfeld, payable to order of Schoenfeld, Cohn & Co., and by the payees duly indorsed; note for $4,000, payable to Mrs. Alexander's order and drawn by said firm. He requested me to sue on these notes and attach the store of the defendants, and if possible make the money. I expressed apprehension that the firm of Schoenfeld, Cohn & Co. would go into bankruptcy, and thus defeat him. He replied that the firm was anxious to save him the money, as it represented confidential debts. I then replied that if the defendants would not voluntarily go into bankruptcy, one great point was saved, for then only the firm's creditors holding the necessary quorum could put the concern into bankruptcy. On looking at the $17,000 note, I found it was payable on demand, and on inquiry I was informed that demand had been frequently made for its payment. I then stated that if I would sue on that note, interested parties would see from the complaint that as the note was forty days overdue, that a ground for bankruptcy proceedings would be furnished to hostile creditors. Being then asked what was the best to be done, I advised that inasmuch as the note was already six months overdue, that my client should procure from the firm of Schoenfeld, Cohn & Co. a note in exchange of this demand note, which would by its terms be payable six months after date. The firm of Schoenfeld, Cohn & Co. took up that demand note, gave Lewis a note bearing the same date, for the same sum, payable in six months.''

Before the commencement of the suit an agreement had been made between Lewis and the local creditors that Lewis would divide the proceeds of the property to be attached and sold on his debt pro rata among them and himself, and that the balance, if any, should be paid to members of the firm, to the exclusion of creditors abroad. The agreement for the pro rata division was known to Mr. Naphtaly before the commencement of the suit. The suit was commenced June 27, 1877, an attachment was issued, and the property of the firm seized. The property seized consisted of a large stock of toy goods. The complaint, stating that the note in suit was made in December, 1876, was verified by Lewis. Mr. Naphtaly states that he instructed his clerk to commence the suit and procure the attachment to be issued, but that he did not instruct him to have the complaint verified.

We further quote from Mr. Naphtaly's statement:

"I took these notes to my office and got my clerk to prepare the complaint. During its preparation I noticed that the $4,000 note of the firm, payable to the order of Mrs. Alexander, was not indorsed, and I returned the note to Mr. Lewis, stating that I could sue on that note in his name, for want of Mrs. Alexander's indorsement. I was then told that it would be a difficult matter to find Mrs. Alexander. As the note was a new note, I inquired concerning it. I was then told that the firm of Schoenfeld, Cohn & Co. did not directly borrow that money from Mrs. Alexander, a widow, but that Mrs. A., having $5,000, she gave it to Mr. Newman to lend it out on interest; that N. had loaned it to Schoenfeld, who had put that money in the firm of Schoenfeld, Cohn & Co., giving Newman his own note for it; that Newman held that note for Mrs. Alexander, and that Mrs. Alexander believed that the money was loaned to the firm, and that the widow collected her interest on that note in the store of the firm of Schoenfeld, Cohn & Co. That the firm had assumed the payment of that indebtedness, and that $1,000 had been paid on account of it, thus leaving $4,000 still due. On calling for her note it was produced. I asked when the firm assumed or became responsible to pay that debt. A date was given me, which I think was about the time when Mrs. Alexander received the payment on account. In order to protect that widow's money, and believing that the partnership had a legal and moral right to assume the payment of that debt, especially as every

dollar went into the firm, I informed Messrs. Schoenfeld, Cohn & Co. that, as they had guaranteed the payment of the money due Mrs. Alexander, they ought to indorse that guaranty on the genuine note rather than give a new firm note for the amount due her.   That was done.''

Referring to the subject of including the Mrs. Alexander note in the suit, Lewis says, in his affidavit, that ''Naphtaly inquired if a note had been given for the loan of $5,000, and where the note was; said Schoenfeld handed it to said attorney, who replied, in substance, that if there is a genuine note there is no use putting into this case a note that may burst the whole thing.''

If the proceedings, being instituted, were legal and just, there was no occasion to fear such a calamity.

We quote again from Mr. Naphtaly's statement:

''Not until several days after the suit was brought by me did I learn of the consideration of the $17,000 note.   After the suit was brought, I learned that Mr. Lewis had agreed with them, Schoenfeld, Cohn & Co., that he would settle all the California indebtedness of the firm.   I agreed to see that his promise would be carried out.   Soon after that, and before judgment could be recovered, the parties came to my office, and then I was told the following in regard to the demand note for $17,000, viz.: That in the year 1876 the firm of Schoenfeld, Cohn & Co. had given to Mr. Newman, who was a member of the firm, its notes for $18,000 for money which Mr. Lewis loaned to the firm through Newman; that Newman became embarrassed through stock transactions; that to raise money Lewis had loaned Newman these $18,000 notes, which Newman then pledged with the London and San Francisco Bank for $6,000; that when Lewis was about to leave this state he asked Newman to procure for him these notes; that N. had not the money to redeem them; that Lewis threatened to redeem them and attach Schoenfeld, Cohn & Co.; that then it was agreed between that firm and Mr. Lewis and Newman that Lewis should be paid $1,000 on account, and that the firm of Schoenfeld, Cohn & Co. should give to Mr. Lewis a demand note for $17,000, but with the agreement that if Lewis ever enforced payment of this $17,000 note, that Lewis should take up from the London Bank these pledged notes, so that they should not be used against the firm.   Mr. Lewis admitted that to be the agreement, and I assured Schoenfeld, Cohn & Co.

that I would see that the agreement was carried out. I was, of course, anxious to get the judgment entered before creditors could put the estate into bankruptcy. I could not tell the California creditors that it was understood that Schoenfeld, Cohn & Co. would not go into bankruptcy, or that Lewis had agreed to share with them in the proceeds of the judgment, as I would then have given to the parties adverse to my client's interests sufficient grounds for bankruptcy proceedings. To my surprise a demurrer to the complaint was filed on the last day when the answer was due; and on inquiry why such a course was taken, I was informed that the attorney who filed the demurrer desired to see me about the agreement Lewis had made to settle with the California creditors, and take up the pledged notes. I was delayed by that proceeding for seven days. In due course I took my judgment.''

The last sentence would indicate that the delay of seven days resulted to the satisfaction of the California creditors. At all events, the judgment was taken, Mr. Naphtaly acting as attorney for Lewis, execution was issued, and the property was seized and sold, Lewis being the purchaser.

It was agreed between Lewis and the firm, and some other local creditors, including one junior attaching creditor, that the property should be sold in large lots, in such manner that it would bring the smallest possible price.

Mr. Naphtaly says in his testimony: "He [Lewis] wished me then to see that the sale is made in large parcels. I told him that it required the consent of the defendant and consent of the Anglo-California Bank, who were subsequent attaching creditors. He brought me the consent of the defendant, and Mr. Brandt [Mr. Naphtaly's clerk] procured the consent of the Anglo-California Bank. I was not at the sale.''

This arrangement was partly interfered with by one bidder, who, apparently, was not a party to the understanding, but it was so far successful that the property was bid in by Lewis for about $19,000 net, and was afterward sold by him in such manner that he received about $44,000. Out of this amount he paid $23,930 for expenses and for the California debts, including the $6,000 to the London and San Francisco Bank, $5,300 to the Anglo-California Bank, $4,750 in full of an $8,000 note included in the suit, and $4,000 to Mrs. Alexander. Mr. Naphtaly says he was not a participant in the

conduct of the sale. He does say, however, that he assured the California creditors they should be paid pro rata out of the proceeds; and it appears that the result of the transaction was that his client received his debt in full—the object for which his services were secured and rendered.

After the rendition of the judgment, Schoenfeld, from some motive, moved to set it aside, Mr. Naphtaly resisting the motion on behalf of Lewis. The affidavits of Lewis and Mr. Naphtaly used in opposition to the motion are in evidence before us here, and from them and Mr. Naphtaly's statement above referred to, and his evidence in court on this hearing, we derive nearly all the facts stated by us. The court denied the motion to set aside the judgment, and that action is suggested as an adjudication by that court that no fraud was committed. That court would have been justified in denying the motion, no matter how fraudulent the transaction had been —for the motion was made by Schoenfeld, and if he was known to all the transactions, as was claimed by Lewis and Mr. Naphtaly, the court could well have refused the motion on that ground. The denying of the motion, then, would not have said there was no fraud, but, rather, there was fraud, and Schoenfeld was a party to it and was therefore in pari delicto, and ought not to be heard to make any such objection to the judgment.

It appears in this case that bankruptcy proceedings were instituted, and that the acts had upon the advice and with the assistance of Mr. Naphtaly were used in resistance of such proceedings.

The judgment of the federal court in a suit brought against Lewis by the assignee was offered in evidence in this court and objected to. We think it is admissible not to show, of itself, the truth of any charge against Mr. Naphtaly in this court, for, for such purpose, these proceedings may be said to be inter alios acta; but it is admissible as a fact, as a part of the history of the case (1 Greenl. Ev., secs. 527, 528, 538, 539; 2 Whar., sec. 823), to show that parties had to resort, as was intended they should if they obtained anything, to steps to set aside the proceedings which had been instituted, and to show that they were actually set aside for fraud. The judgment of that court was that the judgment obtained by Lewis against Schoenfeld, Cohn & Co. was obtained by fraud and

collusion, and was a fraud upon and against the creditors of the firm. The sale, also, was set aside for fraud in fact, and judgment was rendered against Lewis for $81,425.07 principal, and $17,091.26 interest.

Third. From the facts as above given, and considering the law applicable thereto, we are of opinion that Mr. Naphtaly violated his duty as an attorney, not for Lewis alone, but for Lewis and the members of the firm, to advise them how Lewis' claim could be secured, and a pro rata division be made among the California creditors in violation of the bankrupt law, and yet no act of bankruptcy be apparent, and to take the steps necessary to accomplish that object. He advised and caused Lewis to take a note from the firm, substituted for another, changing the date of payment, so that the time of payment should be different from that of the first, and so that it should appear that no act of bankruptcy had been committed, thus misleading other creditors, and attempting to defraud them of their rights—he having been informed at the time that an act of bankruptcy had been committed. The significance of the advice given as to the substitution of the six months' note for the demand note is apparent from the facts that the advice was given June 27, 1877; that the demand note was dated December 23, 1876, and was long overdue, and that the new note was dated December 23, 1876, and was made payable in six months, so that it might appear to have become due a few days only (less than forty days) before the commencement of the suit, and thus avoid the provision of the bankrupt law by which the stoppage of payment of commercial paper might be held to be an act of bankruptcy. He caused a suit to be commenced upon the fictitious note (fictitious as to time of payment and fictitious as to when made). The complaint was verified. Mr. Napthaly states that the verification was not by his instruction. The suit itself and the affidavit for attachment were commenced and made, the writ issued and property seized, at his instigation and by his direction.

In obtaining an attachment an affidavit is required to be made (Code Civ. Proc., sec. 538), that the defendant is indebted to the plaintiff (specifying the amount) upon a contract express or implied, and that the attachment is not sought, and the action is not prosecuted to hinder, delay or defraud any creditor of the defendant. Mr. Naphtaly knew that the object of having the six months' note (the one sued on) exe-

cuted and the suit brought thereon, rather than on the demand note, was for the very purpose of hindering, delaying and defrauding other creditors—making the record show that no act of bankruptcy had been committed; compelling them to ascertain, if they could, that his proceedings were in fraud of the bankrupt law, and to have recourse to the courts to do away with the effect of his acts; and attempting to subject the property to the payment of a false claim. The firm of Schoenfeld, Cohn & Co. agreed that voluntary proceedings in bankruptcy should not be commenced; therefore, it became important to make the record appear as if no creditor had grounds for instituting proceedings in voluntary bankruptcy.

The making of the substituted note and the commencement of the suit upon it was for the purpose of misleading the court, in this: In case of a motion to dissolve the attachment, the court would have required evidence to show that the note was not in fact given as alleged.

Mr. Naphtaly in his statement says that "the firm of Schoenfeld, Cohn & Co. took up the demand note and gave Lewis a note bearing the same date, for the same sum, payable in six months." Referring to the complaint filed in the suit, we observe that it is therein averred that the $17,000 note sued on was executed on the twenty-third of December, 1876, payable to Isaac Newman, and was thereafter by him indorsed and delivered to the plaintiff Lewis. If the transaction was as stated by Lewis and Mr. Naphtaly, a plain business transaction between the firm and Lewis, what occasion was there for Newman to figure as payee as well as joint maker? The firm owed him nothing in regard to this matter. To say the least, it tended to show a false color on the transaction. However, we take the transaction as the parties have presented it to us.

He caused the firm, in furtherance of the same general object, to make a new contract with reference to the Mrs. Alexander note. That debt, as to Mrs. Alexander, was the debt of Schoenfeld; the firm had not guaranteed or assumed its payment. He, however, advised the firm to indorse its guaranty upon the note, thus assuming a liability not before existing in that form to the payee. The asserted reason for that was, that as Schoenfeld had put the money in the business and the firm had paid interest, it was practically the debt of the firm; the real reason was, Mrs. Alexander was out of the way,

and without the guaranty the note could not have been included in the suit.

After being informed that the demand note was itself fictitious, having been given for an assumed indebtedness not existing, he prosecuted the suit to judgment. This action was had with knowledge that the real indebtedness was evidenced by the notes which had been pledged; that the interest of Lewis in the indebtedness was that part of it only which would remain after the payment of the $6,000 and interest to the bank; that at least $6,000 of it was property held by the bank; and that the note which he had advised should be surrendered and a new one substituted was itself simulated, and that in justice and in law Lewis should have relied upon his interest in the $18,000 notes; that not one dollar of the amount of the note sued on was owing by the firm to Lewis; that it was a sheer fabrication; that the full amount of the $18,000 notes would be provable by the bank in bankruptcy proceedings, and that the new note would swell the apparent indebtedness of the firm by the amount for which it was given, and would compel creditors to resort to legal proceedings to show its simulated character; yet with that knowledge, and as a part of a scheme to obtain unjust and illegal advantages over eastern creditors, as an imposition upon the court, and in fraud of the bankrupt law, he prosecuted to judgment the suit upon the note simulated for a fabricated note. In like furtherance of the general purpose, he gave advice as to the sale not warranted by the law. The statute concerning execution sales is (Code Civ. Proc. 694), that "when the sale is of personal property capable of manual delivery, it must be within view of those who attend the sale, and be sold in such parcels as are likely to bring the highest price."

The advice given was not in accordance with the section above referred to, but was in direct conflict with it. Not alone were Mr. Lewis and the members of the firm and the Anglo-California Bank interested, but the firm being insolvent, every creditor, California and eastern, was interested, in having the sale conducted according to law and in such manner as to bring the highest price. The command of the law is clear and express that when the sale is of personal property capable of manual delivery, it must be made in such parcels as are likely to bring the highest price, the only privilege given

by the law to the judgment debtor, if present at the sale, being to direct the order in which the articles of personal property which can be sold to advantage separately shall be sold. This section of the statute has been several times before this court for construction, and its ruling has invariably been in accordance with what has been above stated.

This was done that the plaintiff Lewis might become the purchaser of the property sold by the sheriff at greatly less than its value; which was actually accomplished as stated above. It was done, also, by a combination with the defendants that they might derive a profit from it, to the prejudice of their creditors. There was thus a secret trust for the benefit of the debtors, one of the plainest and significant badges of fraud. These proceedings were an actual fraud upon all creditors not parties to the transaction or who were to be protected by Lewis.

In fact, the substituted note was made and suit was brought upon it, judgment recovered, execution issued, and the property sold in a manner not warranted by law, with the intent to hinder, delay and defraud the eastern creditors of Schoenfeld, Cohn & Co. The rights of such creditors being thus affected by these proceedings, the question whether the substituted note was, as between the parties sustained by a consideration, becomes immaterial, and need not be considered. The transaction was tainted with fraud, and the consequences resulting therefrom attached to it though it had been sustained by any amount of consideration. Such was the judgment in Twyne's Case, 1 Smith's Lead. Cas. 33.

In that case, though the purchaser had paid full consideration for the property bought, yet inasmuch as the purchase was made with the intent to hinder, delay and defraud creditors, it was adjudged null and void. In the case before us the intent is acknowledged.

We notice the caution manifested in the course of the proceedings. In reference to the agreement to divide pro rata with the California creditors, Mr. Naphtaly says: "I assured Schoenfeld, Cohn & Co. that I would see that that agreement was carried out. I was, of course, anxious to get the judgment entered before creditors could put the estate into bankruptcy. I could not tell the California creditors that it was understood that Schoenfeld, Cohn & Co. would not go into bankruptcy, or that Lewis had agreed to share with them in

the proceeds of the judgment, as I would then have given to the parties adverse to my client's interests sufficient grounds for bankruptcy proceedings.''

If the suit was an open business transaction, that of a delinquent creditor taking legal steps to gain priority, he being by law entitled to a gained priority, what was there to fear? It is said, too, that there is no evidence of any debt or claim held by eastern creditors. If California creditors were to share pro rata with Lewis, who were the ''parties adverse'' to Lewis' interests? Who were the ''hostile creditors,'' from whom knowledge must be kept? Why such care taken to conceal evidence of the real nature of the proceedings? If the property of a debtor is to be fairly and equally divided among all, there are no hostile creditors; all have a common object. The California creditors appear to have been paid in full out of the proceeds of the property, leaving a profit in the hands of Lewis. If, then, there were no other creditors than Lewis and those whom he agreed to protect, who was there to institute bankruptcy proceedings? What ground was there for such proceedings? Why apprehend bankruptcy proceedings at all? Why such anxious haste to procure the judgment ''before creditors could put the estate into bankruptcy''?

It seems to us beyond controversy that it was manifest to all—Mr. Naphtaly, Lewis, and the members of the firm—that the firm was hopelessly insolvent, and that a large amount of the indebtedness was held by eastern creditors, and the patent intent was to hinder, delay and defraud them, and that Mr. Naphtaly advised, aided and abetted it in every way, practiced imposition and deceit upon the court, and took no step backward. By such means the bankrupt laws were evaded and a fraud was practiced on their provisions. To counsel or maintain such actions and proceedings could not appear, and did not appear, to be legal or just. And the artifices resorted to misled and imposed on the court. The fraud in hindering and delaying creditors was attempted to be further carried out by a fraud on the provisions of the bankrupt law, one of the chief designs of which was to forbid and deprive of all force such proceedings. To carry out this design to defraud creditors steps were taken to conceal evidence which would have shown acts of bankruptcy. It was well known that proceedings in bankruptcy would have caused the whole plan to miscarry, and fail of its intended end and aim. To prevent this, evidence was covered up by an artifice based on

falsehood; a note and contract were fabricated, on which suits should be brought and attachments sued out and property seized and sold by collusion with and procurement of the bankrupts, and the court was thus misled and imposed on. Such conduct was in clear violation of his duties as an attorney and counselor at law.

It is not proper to consider this piecemeal, but in its integrated mass. Considering the separate steps in the transaction, isolating one step from another, it might be ingeniously argued that innocence should be predicated of each one of them. But the just deduction is to be made from all the facts of the case. The intent which pervades them is thus clearly shown, and it becomes more apparent as one fact succeeds another. The force of the evidence is thus increased as the facts multiply in a ratio which it would be difficult to indicate in language. As one fact is added to another, the testimony which embraces the intent is multiplied in force. As is said by Starkie in his great work on Evidence, "Where each of a number of independent circumstances, or combination of circumstances, tends to the same conclusion, the probability of the truth of the fact is necessarily greatly increased, in proportion to the number of those independent circumstances": Starkie on Ev., 9th Am. ed., 852, and note illustrative of the text. The whole mass of facts thus considered prove the intent to defraud, as above pointed out.

The statute of this state authorizes us to either remove or suspend. This is the first case of this character which has been brought before this court. While, therefore, we are not at liberty, nor have the desire, to omit our duty in the premises, yet, in choosing between penalties, we take into consideration the heretofore good standing of the respondent, and give him credit for the suggestion that possibly he may have, for the moment, overlooked his duty as an officer of the law, in his eagerness to serve his client, and we propose to affix such penalty only as will indicate the estimate we attach to professional conduct.

The judgment of the court is that respondent be suspended as an attorney and counselor at law for the period of six months from this day.

I concur: McKee, J.

I concur in the judgment and the conclusions reached by Justice Myrick: Thornton, J.

ROSS, J.—I concur in the judgment. According to the testimony before us, when in June, 1877, Mr. Naphtaly's legal advice was sought, there were outstanding notes of the firm of Schoenfeld, Cohn & Co., aggregating $18,000, drawn in favor of Newman, by him indorsed to Lewis and by the latter permitted to be pledged to the London and San Francisco Bank, Limited, as collateral security for certain moneys advanced by the bank. These notes were payable on demand and evidenced all the indebtedness from Schoenfeld, Cohn & Co. to Lewis. There was also then (in June, 1877), in existence a simulated note for $17,000, dated December 23, 1876, executed by Schoenfeld, Cohn & Co., to Lewis. I say simulated, because this note purported to represent an indebtedness that did not exist—the true and only indebtedness to Lewis being evidenced by the notes then held by the London and San Francisco Bank, Limited, as collateral security for the moneys it had advanced on the faith of those securities. When Mr. Naphtaly's legal advice was sought, the firm of Schoenfeld, Cohn & Co. was insolvent, and he knew it. Extensive purchases of goods had been but recently made by the firm, which had not been paid for. A scheme was then concocted by Schoenfeld, Newman and Lewis looking to the application of these goods as well as the balance of the stock of the insolvent firm to the payment of the amount due Lewis and the local creditors, and to the securing of the remainder to the members of the firm. This purpose was palpably fraudulent. Whether, when first retained, Mr. Naphtaly was informed of the whole of the scheme is immaterial, for he admits that he advised the execution by the firm of a simulated note for $17,000, as of date December 23, 1876, and payable six months after its date, on which he proposed to bring, and did bring, an attachment suit in Lewis' name, by virtue of which the property was attached and subsequently sold. His purpose in thus advising and acting, as explained by himself, was to prevent any proceedings in bankruptcy on the part of those creditors not a party to the conspiracy. And according to his own statement, he was fully informed of the fraudulent nature of the scheme shortly after the commencement of the action, and, with that knowledge, he prosecuted the suit to judgment, and subsequently resisted, professionally and by his personal affidavit, a motion to vacate the judgment made on behalf of one of the partners who had,

from some cause, become dissatisfied with the plan or its execution.

All this involved falsehood and deception on the part of the promoters and prosecutors of the scheme, fraud on the creditors not parties to it, and imposition on the court. When, in June, 1877, Schoenfeld, Cohn & Co., signed the note to Lewis, antedated December 23, 1876, and made payable six months after the fictitious date, Lewis was not entitled to any note from them, for there remained in existence the notes from them evidencing the amount due him, and which were still held by the bank as collateral security. Not only was Lewis not entitled to another note from the firm (the execution of which Mr. Naphtaly advised), but the note was made to speak falsehood after falsehood, for the unlawful and fraudulent purpose of deceiving those creditors of the firm not parties to the conspiracy; and it was this note that the court was made the innocent instrument in enforcing by one of its own officers. Mr. Naphtaly testified before us that in acting as he did he did not realize he was doing anything wrong, but thought he was justified in thus securing advantages to his clients. I am inclined to think he did not sufficiently reflect before advising and acting, and hence I am disposed to make the punishment reasonably light. But it would never do for the court to acquit him of blame in the face of such facts as are presented to us. Judicial sanction of such proceedings would, in my opinion, surely and justly bring the courts as well as the bar into disrepute and contempt.

We concur: McKinstry. J.; Morrison, C. J.

SHARPSTEIN, J.—I dissent. The evidence in this case, as I construe it, shows that in the month of June, 1877, one Lewis applied to the respondent to bring an action against Schoenfeld, Cohn & Co., upon certain promissory notes, of which said Lewis represented himself to be the indorsee. Among said notes was one for $17,000, dated December 23, 1876, payable on demand. The respondent ascertained from the indorsee that this note had been due more than forty days. Thereupon respondent informed said indorsee that the fact that the makers of said note had suffered the same to remain unpaid for a period of forty days after it had matured would of itself constitute an act of bankruptcy, and that a complaint filed upon that note would necessarily disclose that the

makers of said note had committed an act of bankruptcy. To avoid that, the respondent suggested the execution of a new note, for the same sum, and of the same date as the old one, payable six months after date. That suggestion was followed, and an action was commenced on the new note by filing a complaint verified by the plaintiff in the usual form, and an attachment was sued out by filing an affidavit in the usual form.

It is urged that the allegation in the complaint that the note was made on the day of its date was false, and that the respondent knew it to be false when the complaint was verified. The evidence upon this point is that the respondent did not prepare the complaint, or direct that it should be verified, or know that there was any intention to have it verified, or that it had been verified, until after it had been filed. I do not think that he can be held criminally· responsible for an act done by another without his advice or knowledge.

It is further urged that the affidavit upon which the attachment was obtained was false, because it was stated in said affidavit that the attachment was not sought and the action was not prosecuted to hinder, delay or defraud any creditor of the defendants.

I have always supposed that where an attachment ·was sought and an action prosecuted by a person for the purpose of securing the payment of his own demand, that he might safely make that affidavit, although the result of suing out such attachment might not only be to hinder and delay other creditors, but to render their claims against the defendant worthless. The object of the attaching creditor in such a case being to secure the payment of his own demand, without reference to how others might be thereby affected. And I do not understand that, in the absence of any bankrupt law, this would be disputed. And the bankrupt law did not forbid the security of a preference by one creditor over all others by attaching all the property of his debtor: Barbour v. Priest, 103 U. S. 295, 26 L. Ed. 480; Wilson v. City Bank, 17 Wall. 473, 21 L. Ed 723. The fact of the debtor's property might be all absorbed, in the payment of the attaching creditor's claim. It is therefore obvious that it was not the intention of the bankrupt act to deprive an attaching creditor of any advantage which he might secure over other creditors of a common debtor by being the first to attach the property of such debtor.

But it is said in reply that if this be so, the respondent, by advising the substitution of a note which would not show on its face that the makers had committed an act of bankruptcy for one that did show that they had, counseled the perpetration of a fraud. In other words, his client wished to obtain a preference over all other creditors of his debtors, and the respondent told him that if said debtors chose to go into bankruptcy, or if any creditor or creditors could find any good ground for throwing them into bankruptcy, he could not obtain any preference by being the first to sue and attach. The respondent was assured that the debtors would not voluntarily go into bankruptcy, but on an inspection of the $17,000 note he discovered that it had been due more than forty days, and he then informed his client that if one-fourth in number of creditors of the makers discovered that fact, they might throw them into bankruptcy, as that of itself constituted an act of bankruptcy. And to obviate that, he advised the surrender of that note to the makers and the execution of a new note by them which would not on its face show that they had committed an act of bankruptcy. It cannot be denied that as between the makers and payee of the note this transaction was perfectly legitimate. They had a perfect right to make and he to take a new note in the place of the old one. And as between themselves they had a right to antedate if they chose. But the objection which is made to this transaction is, that the object of making and taking a new note was to conceal from the creditors of the makers the fact that they had committed an act of bankruptcy. Not to disclose was to conceal. Was it the duty of the respondent on discovering that his client's debtors had committed an act of bankruptcy to advise that the fact be at once published? I presume that it will not be claimed that it was. On the other hand, I think that it will be admitted that it was his duty to conceal it. The law would not permit him, without the consent of his client, to disclose it. ''An attorney cannot, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon in the course of professional employment.'' (Code Civ. Proc., 1881.) His lips were sealed.

As before stated, the antedating of the note was not an illegal act. But it is claimed that the antedating of it for

the purpose of concealing the fact that the makers of it were bankrupt was a gross wrong upon their creditors. In Gladwin v. Gladwin, 13 Cal. 330, the counsel for the intervener contended that "the antedating of the note sued on—the manufacture of a present cause of action out of debts not due —the agreement that plaintiff sue out attachment by way of securing the debt; these facts, appearing without explanation, were a fraud in law upon the other creditors." But the court held in effect that the note having been executed upon a sufficient consideration, its validity was not affected by the circumstances above stated. The court in that case cited Dana v. Stanfords, 10 Cal. 269, Little v. Little, 13 Pick. (Mass.) 426, Cushing v. Gore, 15 Mass. 73, Haseltine v. Guild, 11 N. H. 390, which seem to me to hold that a creditor of an insolvent debtor may secure a preference over other creditors quite as questionable as those which the respondent advised should be resorted to for the purpose of giving his client a preference over other creditors. And as the act which he counseled was not legal, it does not seem to me that the existence or nonexistence of a bankrupt law at the time is a material circumstance. The act was neither malum prohibitum or malum in se, and would therefore be quite as reprehensible when there was not as when there was a bankrupt law in force. Other creditors would be prejudiced just the same in either case. If, in the absence of a bankrupt law, an attorney would be justified in advising parties to do what was done in the cases above cited, for the purpose of giving one creditor a preference over all other creditors, I am unable to perceive why the respondent might not advise what he did without incurring the penalty of disbarment or suspension. It is not illegal for one creditor to obtain a preference over other creditors. Nor is it illegal to antedate a note. How, then, can it be a misdemeanor to advise the doing of two legal acts? Or the doing of a legal act for the purpose of accomplishing a strictly legal object?

Assuming, however, that the views which I have above expressed are erroneous, it seems to me that there is a total absence of proof to support the charge based upon the antedating of the $17,000 note. I have examined the evidence very carefully, without discovering anything in it which proves or tends to prove that any creditor of the makers of that note were prejudiced by the antedating of it. It is

claimed that the object of antedating it was to defraud eastern and European creditors. But I am unable to find from the evidence before us that there are, or ever were, any such creditors. They are alluded to as if they did exist. The respondent, in his testimony, says he knew nothing of their existence until long after the suit was brought and attachment levied. But it is not stated who they were, how many there were, the amount or nature of their claims, or whether those claims were paid or not. For anything that appears to the contrary, they may have been satisfied with the course pursued by the parties here.

It appears by a decree which was offered in evidence that the firm which made the note has been adjudged bankrupt, not at the instance of any creditor of the firm, but upon the petition of a member of it. The respondent's responsibility is for the advice which he gave upon the facts which he knew or which had been communicated to him at or before the time when he gave it.

As I read the testimony, there is no evidence tending to prove that the respondent did, but there is evidence tending to prove that he did not, know before the commencement of the action upon said $17,000 note that the defendants in that action had any eastern or European creditors, or that there was a note in the Anglo-California Bank which had been given for the same loan that the note sued on was given for, or that there was an agreement between the plaintiff and defendants in that action that whatever surplus might remain of the amount realized on the sale of the property attached, after satisfying the plaintiff's judgment and the California creditors, should be turned over to the defendants, or that the notes sued on did not represent a bona fide indebtedness of said firm.

As to the selling of the goods in bulk instead of parcels, the respondent testifies that he did not advise that they should be so sold, and no one testifies that he did.

The measures taken to protect Mrs. Alexander appears to me to have been eminently proper. One of the partners had been acting as her agent, and it was his duty in her absence to protect her interest: Barbour v. Priest, supra.

It is quite evident that an impression prevails that the respondent's client and the firm of Schoenfeld, Cohn & Co. entered into a conspiracy to defraud the creditors of said firm,

and that for that purpose an action against the firm was commenced and an attachment sued out with the intention of transferring the goods belonging to said firm to respondent's client, at a great sacrifice, so that he might resell the goods at private sale and realize a large profit thereon, to be divided between him and the members· of said firm. Whether there is any evidence before us to support that theory I shall not now stop to inquire. The respondent swears that he did not know of any such arrangement, and he is not contradicted. He pleaded not guilty to the charges preferred against him, and the evidence mainly relied upon to support them consists· of a communication written by him to the president of the Bar Association, supplemented by the testimony which he gave in open court on the hearing of this matter. The findings of this court upon the material issues arising upon the pleadings ought to be in accordance with the proof presented. The respondent should be held responsible for the advice which he gave upon the facts communicated to him or which were otherwise within his knowledge. For acts which he did not devise, and designs of which he was ignorant, he cannot justly be held responsible. The advice which a lawyer gives to his client must in nearly every case be based upon the statement of the client. "And it is not the saints of the world who chiefly give employment to our profession. It has essentially and habitually to do with all that is selfish and malicious, knavish and criminal, coarse and brutal, repulsive and obscene, in human life": In the Matter of Goodell, 39 Wis. 245, 20 Am. Rep. 42.